UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY EARLEY, as Personal Representative
of the Estate of STEPHEN ROBERT
KOWALEWSKI, Deceased,

       Plaintiff,

                                Case No. 23-cv-12475
v.                             HON. MARK A. GOLDSMITH

OAKWOOD HEALTHCARE, INC., et al,

       Defendants.

_____/

## OPINION & ORDER GRANTING TAYLOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 47)

Plaintiff Kimberley Earley filed this suit as personal representative of the estate of Stephen

Robert Kowalewski, who died in the City of Taylor Police Department jail.  Among other claims,

she brings deliberate indifference claims against nine individual City of Taylor officers—Chief of

Police John Blair, Corporal Jordan Dodds, Officer Andrew Van Scyoc, Public Service Officer

Jason Michalik, Officer Michael Pilcher, Officer Anna Marie Lumetta, Lieutenant Nick Hill,

Officer Michael Pranger, and Officer Gage Nunally (collectively, "the individually named

Defendants")—and deliberate indifference and state-law claims against the City of Taylor.  These

Defendants ("the Taylor Defendants") move for summary judgment (Dkt. 47).[1]  For the reasons

that follow, the Court grants the motion.

## I. BACKGROUND

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the motion, the briefing includes Earley's response (Dkt. 48) and the Taylor Defendants' reply (Dkt. 51).

Kowalewski died in jail in April 2021 after less than twenty-four hours in the custody of the Taylor Police.  Earley alleges that he died from alcohol withdrawal after receiving constitutionally inadequate care from the Taylor Defendants.

**A. Kowalewski's Arrest and Intake**

Kowalewski was arrested by the Flat Rock Police on an outstanding warrant on April 17, 2021.  Defs.' Statement of Material Facts (SOMF) ¶ 2 (Dkt. 47).  He was transferred to the custody of the Taylor Police at approximately 10 a.m. the same day, escorted by Defendants Dodds and Van Scyoc.  SOMF ¶¶ 2–3.  A Taylor Public Service Officer (PSO), Tyler Payne, completed his intake at the Taylor jail, which included a medical history.  SOMF ¶ 3.  His booking record, completed by Payne, reflected that he had a history of alcohol withdrawal and that his "last drunk date" was less than a week prior to his arrest.  Pl.'s Counter-Statement of Material Facts (CSOMF) ¶ 2 (Dkt. 48) (citing  Kowalewski's Booking Record at PageID.683 (Dkt. 48-2)).  According to Payne, he checked the box for alcohol withdrawal if the detainee answered in the affirmative when asked "Do you suffer from alcohol or drugs?"  Payne Dep. at PageID.533 (Dkt. 47-4).  Kowalewski also told Payne that he took medication for Parkinson's disease but did not have anybody to bring his medications to the jail.  Michigan State Police Rpt. at PageID. 515 (Dkt. 47-2); Payne Dep. at PageID.530.

After the end of Payne's shift at 6:30 p.m., and through the rest of his detention, Kowalewski was supervised by another PSO, defendant Jason Michalik.  SOMF ¶¶ 3–4.  Michalik testified that he did not see the booking record that recorded Kowalewski's medical history, but Payne mentioned Kowalewski's Parkinson's disease during the handoff.  SOMF ¶¶ 5, 18; Michalik Dep. at PageID.550 (Dkt. 47-7).  Payne may or may not have told Michalik about Kowalewski's

history of alcohol withdrawal. Compare SOMF ¶¶ 5, 18 with Reply at PageID.957–958.[2] Through the night, Michalik conducted routine jail checks every half hour. SOMF ¶ 5; see also Jail Check Log at PageID.527 (Dkt. 47-3).

### B. Kowalewski's Hospitalization

At around 9:40 p.m., Kowalewski told Michalik that he had Parkinson's disease, had not taken his medication, and wanted to go to the hospital. SOMF ¶ 6. During this conversation, he had what Michalik described as an apparent seizure, during which he fell to the floor of the cell and appeared to cut his hand. Id.; Taylor Police Rpt. at PageID.520 (Dkt. 47-3). Michalik sought emergency medical help and Kowalewski was taken to the hospital. SOMF ¶ 6; Taylor Police Rpt. at PageID.520.

A doctor at Beaumont Hospital diagnosed Kowalewski with a hand abrasion, a chronic essential tremor, and a history of Parkinson's disease. SOMF ¶ 16; Hospital Record at PageID.536 (Dkt. 47-5). He was discharged with no medical instructions except to follow up with his primary care physician within two to three days and to "return with any worsening of [his] symptoms, increased or uncontrolled pain, or any new concerns." Hospital Record at PageID.540.

Kowalewski was escorted back to the Taylor jail by Defendants Pilcher and Lumetta, and returned to the holding cell at approximately 10:45 p.m. SOMF ¶ 7. Lumetta provided Michalik with his discharge paperwork and the news that he had been medically cleared by hospital staff. Id.

### C. Kowalewski's Deterioration and Death

---

[2] Payne does not recall his conversations with Michalik about Kowalewski but he testified that, during a handoff, he might discuss the detainee's booking record and would typically mention a detainee's alcohol withdrawal. Payne Dep. at PageID.937 (Dkt. 49) ("Q: When a person tells you that's in custody that they suffer from alcohol withdrawal, that's a piece of information that you would share with the jailer taking over for you when your shift ended; correct? A: Correct.").

After Kowalewski returned to the holding cell, Michalik resumed his half-hourly checks of the cell, conducted from adjacent hallways, over the intercom system, or from the dispatch center, which yielded "a clear view of Kowalewski" in his cell.  SOMF ¶ 8; CSOMF ¶ 8. Kowalewski's incarceration is also captured in video recordings of the cells.  SOMF ¶ 23.

### 1.  Early Symptoms

The Defendants agree that the video of the holding cell shows Kowalewski exhibiting troubling behaviors in the hours after he returned from the hospital.  See SOMF ¶ 26; Michalik Dep. at PageID.559–560 (Dkt. 47-7).  He convulsed in an apparent seizure, vomited on the floor of the cell, and thrice fell onto the floor while standing or attempting to stand.  CSOMF ¶ 8 (citing Holding  Cell  Video  1:13:04–1:14:00  1:20:40–1:24:52,  1:34:10–1:40:30,  1:41:50–1:43:25, 1:45:35–1:52:00) (Dkt. 48-7)).  Earley also contends, based on the video, that Kowalewski was visibly "trembling" and "unsteady" and may have vomited into the toilet on several occasions.  See CSOMF ¶ 8.

According to the Defendants, Michalik did not see Kowalewski seize or fall because he "wasn't watching [Kowalewski] at the exact moment these symptoms were exhibited."  SOMF ¶ 26; Michalik Dep. at PageID.559, 571; see also Reply at PageID.958.  In his report, Michalik's observations of this period are limited to noting that, at one early point, Kowalewski was "pacing" and "fidgeting" with the toilet, which Michalik worried was an attempt to flood the cell.  Taylor Police Rpt. at PageID.522.  Earley contends that Michalik's fidgeting was in fact tremors and that his apparent fiddling with the toilet was "delirious behavior."  See CSOMF ¶ 8.

### 2.  The 2:20 a.m. Interaction

After his third fall, Kowalewski knocked on the cell door and pointed at the spot on the floor where he had vomited.  Holding Cell Video, 1:46:30–1:47:31.  Thereafter Michalik opened

the door and spoke to Kowalewski through it for about four minutes.  Holding Cell Video, 1:47:45–1:52:05.  According to Michalik's report, Kowalewski told Michalik that he had vomited but, when Michalik asked if he "had any other medical problems or drug addictions that would require medical attention," Kowalewski said "he just had an upset stomach."  Taylor Police Rpt. at PageID.522.  Earley contends that the video shows that Kowalewski was visibly "frustrated" and "relying on the wall for support" during the conversation.  CSOMF ¶ 9 (citing Holding Cell Video, 1:46:43–1:47:45).  This interaction occurred at approximately 2:20 a.m.  SOMF ¶ 9; Taylor Police Rpt. at PageID.522.

According to Michalik's report, Michalik conducted his next cell check at approximately 2:57 a.m. and found that Kowalewski "appeared to be alert" and "did not appear to be in any distress."  Taylor Police Rpt. at PageID.522; SOMF ¶ 10.  Based on video footage that Earley estimates coincides with the cell check, Earley contends that Kowalewski was "in clear distress" at the time of the check.  CSOMF ¶ 10 (citing Holding Cell Video, 2:29:50–2:32:09).

### 3.  Further Symptoms

The video footage shows that, over the ensuing hours, Kowalewski suffered further medical symptoms, including another episode of convulsions and another fall, after which he remained lying on the cell floor for over ten minutes and apparently struggled to stand up.  CSOMF ¶ 8.  He also repeatedly approached the cell door and glass partition, and he ultimately removed his shirt and slid it underneath the partition into the hallway outside the cell.  CSOMF ¶¶ 8, 10.  Earley characterizes this conduct as "attempt[s] to get medical attention" from jailers and as "delirious behavior."  Id.  Again, the Defendants deny that anybody saw Kowalewski's symptoms or actions.  Reply at PageID.958.

### 4.  The 5:12 a.m. Interaction

Michalik spoke with Kowalewski again at approximately 5:12 a.m. when he noticed during a jail check that Kowalewski had taken off and discarded his shirt.  SOMF ¶ 11.  He observed that Kowalewski "had become agitated."  Id.  Kowalewski told Michalik that "he wanted to get out the cell" and began to kick and punch the glass cell partition.  Taylor Police Rpt. at PageID.523.

According to Michalik's report, Michalik concluded that Kowalewski did not appear to need medical attention, and Kowalewski did not request it.  SOMF ¶ 11; Taylor Police Rpt. at PageID.523.  Michalik understood that Kowalewski's agitated behavior was not a symptom of Parkinson's disease.  Michalik Dep. at PageID.558.  Instead, he viewed it as a change in "demeanor."  Id. at PageID.557–558.  He testified that he could not recall what specifically he attributed the change to, but he "would assume [he attributed it to] some sort of mental health issue."  Id. at PageID.565.[3]  He responded by electing to move Kowalewski to the detox cell, "fearful that Kowalewski would injure himself" in the holding cell.  SOMF ¶ 12.[4]

### 5.  Events in the Detox Cell

With the assistance of Defendant Pranger, Michalik moved Kowalewski to the detox cell at approximately 5:35 a.m. on April 18.  SOMF ¶ 12.  Kowalewski walked to the detox cell but he was unsteady and was guided by the officers.  Michalik Dep. at PageID.566.

The video footage shows that, after less than ten minutes alone in the detox cell, Kowalewski experienced what the Defendants concede was an apparent "medical event."  SOMF ¶ 24.  Kowalewski convulsed in a prone position on the floor, emitting a groan which is audible in

---

[3] Similarly, though Michalik thought it was abnormal for a detainee to take off and discard his shirt, he did not think such behavior was necessarily indicative of confusion or delirium.  Michalik Dep. at PageID.562.

[4] Earley disputes that Michalik moved Kowalewski for this reason, but, as the Defendants note, she does not offer any evidence on this point.  See CSOMF ¶ 12; Reply at PageID.959.

the video.  Detox Cell Video 7:29-11:15 (Dkt. 48-10).  After he stilled, he remained motionless in the same position—face-down on the floor, with the top of his head near the cell door—for the rest of his time in the cell.  CSOMF ¶¶ 13, 22, 25; SOMF ¶ 24; see also Detox Cell Video.

In the half hour that followed, Michalik checked on Kowalewski at least four times, thrice through the glass and once by physically opening the cell door.  CSOMF ¶ 13; Detox Cell Video, 13:30–19:55, 25:11–27:20, 32:10–32:30; see also SOMF ¶ 25.  Michalik testified that, on each occasion, he determined that Kowalewski was breathing from "the rise and fall of his . . . back."  Michalik Dep. at PageID.568–569; SOMF ¶¶ 13, 21.  He assumed that Kowalewski had "[gone] to sleep after being up all night."  Michalik Dep. at PageID.568; SOMF ¶ 21.

During a final check at approximately 6:28 a.m., Michalik found Kowalewski "not breathing and unresponsive" and notified dispatch to contact emergency services.  SOMF ¶ 14.  Emergency services arrived at the jail at 6:38 a.m. but found Kowalewski dead.  EMS Record at PageID.698 (Dkt. 48-5).  Police officers had tried unsuccessfully to resuscitate him in the interim.  CSOMF ¶ 13.

Kowalewski's death was caused by complications from alcohol withdrawal.  CSOMF ¶¶ 1, 16.  According to Earley's medical expert, Kowalewski clearly exhibited several "signs of severe alcohol withdrawal" in the video footage of his detention: an "alcohol related tremor," distinguishable from a Parkinson's disease-related tremor because of its higher frequency; agitation; and "repetitive behaviors, falling, vomiting, and seizure activity."  Bates Rpt. at Page ID.824–825 (Dkt. 48-13).  Moreover, according to the expert, Kowalewski would not have died if he had received treatment for withdrawal.  Id.

**D.  Taylor Police Training Practices**

Michalik was trained in basic first aid and CPR, and he testified that he knew to seek immediate medical help for detainees who do not exhibit signs of respiration or a pulse.  SOMF ¶ 17; Michalik Dep. at PageID.547–548.  However, he also testified that he had not received training related to alcohol withdrawal during his twenty-three years of employment by the City, and that the Taylor Police Department does not have specific policies or procedures regarding the treatment of alcohol withdrawal among detainees.  CSOMF ¶ 17 (citing Michalik Dep. at PageID.547).  Nor were there trained medical personnel on site at the jail.  Michalik Dep. at PageID.551; see also Ross Rpt. at PageID.591 (Dkt. 47-10).

## II. ANALYSIS[5]

Earley brings federal medical indifference claims against each of the nine individually named Defendants, a federal failure-to-train claim against the City of Taylor, and various state-law claims.  On a motion for a summary judgment, the court must "view the facts and draw all reasonable inferences in favor of the non-moving party." Pittman v. Experian Info. Sols., Inc., 901 F.3d 619, 628 (6th Cir. 2018).  However, summary judgment is proper unless Earley has "set forth specific facts showing that there is a genuine issue for trial."  Id. (punctuation modified).

### A.  The Medical Indifference Claims

Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a constitutional right to be free from deliberate indifference to their serious medical needs.  Greene v. Crawford Cnty., 22 F.4th 593, 605 (6th Cir. 2022).  42 U.S.C. § 1983 provides a cause of action

---

[5] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

for plaintiffs who allege a violation of this protection.  Phillips v. Roane Cnty., 534 F.3d 531, 539 (6th Cir. 2008).

A successful claim has "both an objective component—a sufficiently serious medical need—and a subjective component—a sufficiently culpable state of mind."  Griffith v. Franklin Cnty., 975 F.3d 554, 567 (6th Cir. 2020) (punctuation modified).  Under prevailing standards, the latter component requires only a showing that the defendant "acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  Helphenstine v. Lewis Cnty., 60 F.4th 305, 316 (6th Cir. 2023) (punctuation modified).  However, qualified immunity adds nuance to this scheme.

Qualified immunity doctrine "shields public officials from personal liability under § 1983 unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Helphenstine, 60 F.4th at 326 (punctuation modified).  To preclude a qualified immunity defense, the plaintiff must show not only that the defendant violated his constitutional rights—here, that the defendant's conduct amounted to medical indifference—but also that the right at issue was "clearly established" at the time of the violation.  Id.  While the general right to be free from medical indifference has long been entrenched, id. at 327, the prevailing "reckless disregard" standard was not "clearly established" until the Sixth Circuit's decisions in Brawner (September 2021) and Helphenstine (February 2023).  Lawler ex rel. Lawler v. Hardeman Cnty., 93 F.4th 919, 927–928 (6th Cir. 2024).  Thus, as the Sixth Circuit held in Lawler, a medical indifference defendant is entitled to qualified immunity—and thus to summary judgment—unless his conduct violated the constitutional standard that prevailed when he acted. Id.  In cases like this one, where the conduct at issue predated September 2021, qualified immunity turns not on the "reckless disregard" standard but on its more stringent predecessor, which requires

9

a showing that the defendant "<u>consciously</u> (not recklessly)" disregarded a serious medical risk to the detainee.  <u>Id.</u> at 928. (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 839 (1994)) (emphasis added in <u>Lawler</u>).

Here, the nine individually named Defendants are entitled to summary judgment on the medical indifference claims against them, because Earley cannot prove that they acted with the requisite subjective culpability.  Though Kowalewski's medical needs were objectively dire, the evidence does not support a reasonable inference that the Defendants consciously disregarded his needs.  Qualified immunity, therefore, shields the individual Defendants from liability.

### 1.  Kowalewski's Serious Medical Need

There is little question that Kowalewski had a medical need that was objectively serious enough to support a medical indifference claim.  The plaintiff must show that the need was "sufficiently serious" that its neglect constituted a significant deprivation.  <u>Blackmore v. Kalamazoo Cnty.</u>, 390 F.3d 890, 895 (6th Cir. 2004) (punctuation modified).  A "condition resulting in death" generally suffices.  <u>Howell v. NaphCare, Inc.</u>, 67 F.4th 302, 311–312 (6th Cir. 2023).  Moreover, repeated falls and seizures are both evidence of a sufficiently serious medical need.  <u>See, e.g., id.</u> at 312 (repeated falls); <u>Bertl v. City of Westland</u>, No. 07-2547, 2009 WL 247907, at *5–6 (6th Cir. Feb. 2, 2009) ("seizure-like spasms").  Here, there is no dispute that Kowalewski experienced multiple seizures and falls during his detention, and there is expert evidence that these were symptoms of severe and ultimately fatal alcohol withdrawal.  <u>See</u> Bates Rpt. at Page ID.824–825.

### 2.  Michalik's Deliberate Indifference

Notwithstanding Kowalewski's objectively serious medical need, Michalik is entitled to qualified immunity because Earley cannot establish that he had the requisite culpable state of mind.

As already discussed, Michalik and the other officers are entitled to qualified immunity unless Earley can establish that they consciously disregarded a serious risk to Kowalewski's health. Lawler, 93 F.4th at 927–928.  On this standard, deliberate indifference is "a very high standard of culpability, exceeding gross negligence."  Jones v. Muskegon Cnty., 625 F.3d 935, 947 (6th Cir. 2010) (punctuation modified).  Earley must prove that Michalik "subjectively perceived facts from which to infer substantial risk to [Kowalewski], that he did in fact draw the inference, and that he then disregarded that risk."  Burwell v. City of Lansing, 7 F.4th 456, 466 (6th Cir., 2021) (punctuation modified) (emphasis added).  Her burden is, therefore, "onerous."  Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001).

To meet their burden, plaintiffs can rely on direct evidence that the defendant appreciated the risk to the detainee.  See, e.g., Helphenstine, 60 F.4th at 317–318 (finding deliberate indifference by an officer who testified that he had known that the detainee was "dope sick" and that he had understood that somebody "needed to call" a doctor).  Alternatively, plaintiffs can present circumstantial evidence to support an inference that the defendant consciously appreciated the risk. Comstock, 273 F.3d at 703.  In particular, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Burwell, 7 F.4th at 466–467 (punctuation modified).

Earley does not point to direct evidence that Michalik perceived a serious risk to Kowalewski.  Instead, she relies on two main categories of circumstantial evidence, discussed in turn below.  First, Earley contends that Kowalewski "attempted to get medical attention several times."  Resp. at PageID.677.  But this argument lacks a basis in the record.  Second, Earley contends that Kowalewski's serious medical need was obvious from his symptoms.  See, e.g., id. at PageID.676–677 ("[O]ver the course of eight-and-a-half hours . . . [Kowalewski] seized,

11

vomited, collapsed, appeared to hallucinate, and keeled over in pain numerous times."). This argument, too, fails to support the inference that Michalik knew of the serious risk to Kowalewski's health. The record shows that Michalik knew that Kowalewski had Parkinson's disease and had been cleared by doctors after a seizure, that Kowalewski said he had vomited because of an upset stomach, that he appeared to become agitated early in the morning, that he was unsteady walking to the detox cell, and that he lay down on the floor of the detox cell but appeared to continue breathing. There is no reason to infer that Michalik regarded these behaviors as indicative of a medical emergency rather than more benign causes—like Parkinson's disease, an upset stomach, and mental health disturbances.

Earley's policing expert appears largely to agree with this conclusion. He testified that, at least while Kowalewski was in the holding cell, "I just don't think [Michalik] grasped what he was seeing, and I think he should have, but I don't believe he did." Stanley Dep. at PageID.875 (Dkt. 48-14).[6] This opinion undermines the very conclusion Earley must support. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Smith v. Erie Cnty. Sheriff's Dep't, 603 F. App'x 414, 422 (6th Cir. 2015) (punctuation modified).

    **a. Kowalewski's "plea[s] for medical attention"**

---

[6] When pressed, the expert said that he thought that Michalik knew of the risk to Kowalewski about nineteen minutes after Kowalewski's transfer to the detox cell, when Michalik conducted a cell check by opening the door to the cell onto a motionless Kowalewski. Stanley Dep. at PageID.887. But he did not explain his basis for this view. Moreover, it is also the expert's opinion that Kowalewski was already dead by that point. Id. at PageID.860–861 (testifying that, based on the video of the detox cell and "the totality of the circumstances," he believed that Kowalewski stopped breathing shortly after his medical event and "was dead within a matter of a couple minutes after that").

12

Earley's first line of argument—that Michalik knew of Kowalewski's medical need because Kowalewski asked for medical attention—is not sustainable for the straightforward reason that Earley has not provided evidence that Kowalewski did ask for medical attention following his return from the hospital.  According to Michalik's report, Kowalewski did not ask for medical attention during either of his two conversations with Michalik after his return from the hospital— indeed, after he vomited, he denied needing medical attention when Michalik asked.  Taylor Police Rpt. at PageID.522–523.  Michalik also testified that he did not recall Kowalewski ever asking him for medical attention, and that he would have recorded and responded to any such request. Michalik Dep. at PageID.557, 571; see also SOMF ¶ 26; Reply at PageID.958–959.

Earley's only basis for questioning this testimony is her speculative interpretation of the soundless video footage of Kowalewski's cell.  She contends that the video shows Kowalewski making "what appears to be a plea for medical attention" by pointing to his vomit in conversation with Michalik at 2:12 a.m.; that, during the 5:20 a.m. interaction when he kicked and punched the glass partition, he "looked to be pleading with" Michalik; and that he made other "attempt[s] to get medical attention" while alone in his cell.  CSOMF ¶¶ 8–11 (citing Holding Cell Video).  But the video does not record the words that Kowalewski and Michalik said to each other, and Earley does not point to anything else in the video that supports her supposition of what Kowalewski was trying to communicate.

Because Earley's interpretation of the video is entirely speculative, it cannot create a genuinely disputed issue of fact.  Prosper v. Martin, 989 F.3d 1242, 1252–1253 (11th Cir. 2012) (holding that when the plaintiff's interpretation of a video "amounts to mere speculation," it cannot sustain a genuine dispute of fact).  It is true that, when there is video footage of the events in question and the video can reasonably be "interpreted in multiple ways," the summary judgment

standard requires courts to interpret the footage in the light most favorable to the non-moving party.  Latits v. Phillips, 878 F.3d 541, 547 (6th Cir. 2017).  But Earley had to point to some record evidence—inside or outside the video—that would allow a reasonable jury to accept her interpretation of the video as showing Kowalewski pleading for help.  Absent such evidence, it would be wholly speculative for a jury to infer from the video alone that Kowalewski asked for help.  Holland v. Fam. Dollar Stores of Mich., No. 24-12296, 2026 WL 297213, at *6 (E.D. Mich. Feb. 4, 2026) ("Any speculation that a factfinder might engage in while watching the video . . . would not be enough for a reasonable jury to find that Plaintiff met her burden of proof . . ."); Ames v. City of Tempe, 665 F. Supp. 3d 1013, 1017–1018 (D. Ariz. 2023), aff'd, No. 23-15609, 2024 WL 1502267 (9th Cir. Apr. 8, 2024) ("[I]t was not enough for Plaintiff to attempt to create 'metaphysical doubts' about the accuracy of the officers' sworn testimony by pointing to video footage that no reasonable juror could view as confirming or contradicting that testimony.") (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

### b.  Kowalewski's symptoms

This leaves Earley with her argument that Kowalewski manifested symptoms that made his medical need obvious.[7]  Earley contends that Kowalewski was "in obvious distress" during both his 2:20 a.m. and 5:12 a.m. conversations with Michalik.  CSOMF ¶¶ 8, 11–12.  She also contends, based on the video footage, that Kowalewski's behavior demonstrated his "obvious medical distress" or "clear distress" at various other times before, between, and after his two

---

[7] Of course, even if Kowalewski did not ask for medical attention or expressly rejected it when it was offered, Michalik may still have been deliberately indifferent to his medical needs if he exhibited symptoms that made his medical need obvious.  See, e.g., Gillman v. City of Troy, No. 21-12762, 2023 WL 4747522, at *3, *9 (E.D. Mich. July 25, 2023), rev'd in part on other grounds, 126 F.4th 1152 (6th Cir. 2025) (holding that a jury could find that a jailer was deliberately indifferent to a detainee's medical needs even if the detainee had responded "no, that she was fine" when the jailer asked whether she wanted medical attention).

conversations with Michalik at 2:20 a.m. and 5:12 a.m., including during Kowalewski's early minutes in the detox cell.  See CSOMF ¶¶ 8, 10–11, 13.

Two guiding principles are useful in assessing this evidence.  First, the inquiry must focus on whether the defendant's "observations and interactions" with the detainee "indicate[d] that [the detainee] had a serious medical need."  Hinneburg v. Miron, 676 F. App'x 483, 487–488 (6th Cir. 2017) (emphasis added).  The detainee's actions outside the defendant's presence, unbeknown to the defendant, cannot prove deliberate indifference.  Id.  Second, to support an inference that the defendant knew of detainee's serious need, the symptoms must be sufficiently serious that the "substantial risk" to the detainee can be deemed "obvious."  Burwell, 7 F.4th at 466–467 (quoting Rouster, 749 F.3d at 447).  The plaintiff must point to "circumstances clearly indicating" that the detainee had a serious medical need.  Blackmore, 390 F.3d at 896 (emphasis added).  Earley has not pointed to any evidence in the record that complies with both principles—symptoms that were both observed by Michalik and so clearly dangerous as to make Kowalewski's need obvious.

The first principle means that Kowalewski's symptoms, no matter how obviously concerning they were, cannot constitute evidence of Michalik's deliberate indifference unless Michalik was actually aware of those symptoms.  Hinneburg, 676 F. App'x at 488 ("[T]he court cannot attribute observations to the defendants that they did not in fact observe.").  Thus some of the video evidence that Earley points to must be disregarded because it pertains to periods in which Kowalewski was alone in his cell and there is no evidence that Michalik—or anybody else—was watching.  This includes the video evidence of Kowalewski's repeated falls and seizures.  For the most part, Earley's only basis for suggesting that Michalik observed Kowalewski during these times is speculation that he might coincidentally have been conducting a cell check—or otherwise looking into the cell—at the time.  See, e.g., CSOMF ¶ 33.  In addition, on three occasions, Earley

15

estimates that a specific cell check roughly coincided with one of Kowalewski's symptoms.  See CSOMF ¶¶ 8, 10 (Kowalewski appeared to vomit "around the time" Michalik was conducting a cell check, had a seizure "around the time" Michalik was conducting another cell check, and "appear[ed] to be in clear distress" at the time of the 2:57 a.m. cell check).

But the mere timing of Michalik's cell checks does not create a genuine question of fact about whether he observed symptoms that Kowalewski exhibited while alone in his cell.  Earley's attempts to match Michalik's cell checks to video snippets are extremely imprecise: Michalik generally did not record the exact timing of his checks, and, even if he had, the video in evidence is not time-stamped.  More importantly, even if Earley could establish with precision that Michalik was conducting a cell check at a moment when Kowalewski was experiencing a serious symptom, that would not suffice to prove that Michalik "subjectively perceived" the symptom.  Burwell, 7 F.4th at 466, 470.

In Burwell, the decedent spent over an hour on the floor of his cell, lying unconscious in a visible pool of his own vomit, and one of the defendants performed a welfare check of his cell during that period.  Id. at 461–462, 470.  But the defendant said that her cell check had been cursory and she had not noticed the vomit when she glanced at the decedent.  Id. at 470.  The Sixth Circuit affirmed summary judgment in favor of the defendant, holding that there was "nothing in the record to support a finding that she witnessed [the detainee] lying unconscious in vomit"—even though she had conducted a cell check at precisely the time that the detainee was lying unconscious in vomit.  Id.  To infer that a defendant had subjectively perceived the decedent's condition, the Sixth Circuit required additional evidence—such as testimony and video evidence that the defendant had looked directly into the cell at an angle from which the decedent's condition would be visible.  Id. at 472–473.  Earley has not offered such evidence.

16

As a result, if Earley is to rest her showing of deliberate indifference on Kowalewski's obvious medical need, she must prove that Kowalewski's obvious need was manifest in the symptoms that Michalik demonstrably observed.  These include Kowalewski's first seizure (the impetus for his hospitalization); perhaps his tremors, or the "fidgeting" and pacing that Michalik recorded in his report; his vomiting; his agitation in his 5:12 a.m. interaction with Michalik; his unsteadiness while walking to the detox cell; and his lying still on the floor of the detox cell.  There is evidence that each of these was a symptom of Kowalewski's severe alcohol withdrawal.  Bates Rpt. at PageID.824–825.  But, evaluating the symptoms "based on the information that was available to [Michalik] at the time," without "the benefit of hindsight," a jury could not reasonably conclude that these symptoms alerted Michalik to an obvious medical emergency.  Burwell, 7 F.4th at 466 (quoting Williams v. Mehra, 186 F.3d 685, 692 (6th Cir. 1999) (en banc) and Rouster, 749 F.3d at 453).

A detainee's need for medical care is obvious from his symptoms when "[a]nyone who observed him in that condition would have understood his critical need for medical attention." Burwell, 7 F.4th at 465, 473; see also Cain v. Irvin, 286 F. App'x 920, 927 (6th Cir. 2008) ("[T]he obviousness test is whether a layperson would perceive the need for immediate medical assistance.")  For example, if a plaintiff offers evidence that an officer saw a detainee "lying unconscious in a pool of his own vomit," a reasonable jury could infer that the officer knew the risk to the detainee.  Burwell, 7 F.4th at 473.  A jury could infer likewise if the officer saw the detainee "almost comatose, unresponsive, and having seizure-like spasms," Bertl, 2009 WL 247907, at *6, or "collapsed" and "foaming at the mouth," Speers v. Cnty. of Berrien, 196 F. App'x 390, 398–399 (6th Cir. 2006).  However, a detainee's need is not sufficiently obvious—for purposes of inferring deliberate indifference—when his symptoms are consistent with more benign

explanations, such that an observer does not necessarily have "reason to appreciate the seriousness of [the detainee's] condition." Id. at 396; see also Lawler, 93 F.4th at 935–936 (holding that juries cannot infer that a detainee's suicide risk was obvious when "an inmate's potentially suicidal conduct could be explained on other grounds").

On point is Jackson v. Wilkins. There, several officers did not seek emergency medical attention for a detainee even though they knew that he had been injured when arresting officers used a Taser on him, that he "was unable to walk on his own, that he had trouble communicating, that he had defecated on himself, and that he vomited in his cell." 517 F. App'x 311, 315, 320 (6th Cir. 2013). In fact, at least some of the officers watched the detainee continually "rolling around on the floor" and "defecat[ing] on himself" in his cell. Id. at 316. But, as one of defendants testified, the officers assumed that the detainee was simply "extremely intoxicated." Id. at 320. For the Sixth Circuit, this made it "an easy case." Id. The court affirmed a grant of summary judgment for the defendants, finding that the plaintiff could not "prove that [the defendants] knew a substantial risk of serious harm existed": even though they observed various serious symptoms, they "had little reason to believe that [the detainee] might be seriously injured." Id.

In light of cases like Jackson, the symptoms that Kowalewski exhibited in Michalik's presence cannot prove that Michalik knew of a substantial risk to Kowalewski. Instead, those symptoms were consistent with the conduct of an inmate with Parkinson's disease who, over the course of a night in detention, fell asleep after experiencing a benign seizure, an upset stomach, and mental health difficulties. They were not sufficient to notify Michalik that Kowalewski's medical condition was severe, much less that it was life-threatening.

Michalik knew, of course, that Kowalewski had said he had Parkinson's disease. Kowalewski's "fidgeting" or tremor would not be obviously concerning to someone who thought

18

that such a person had Parkinson's. Michalik also watched Kowalewski experience the apparent seizure and fall that led to his hospitalization. But, knowing that Kowalewski had been evaluated and cleared by a doctor afterward, he could have relied on the doctor's implicit assessment that Kowalewski's seizure did not raise any immediate medical risks, so there is no reason to infer that the seizure alerted him to Kowalewski's dire condition. McGaw v. Sevier Cnty., 715 F. App'x 495, 498–499 (6th Cir. 2017) (holding that officers were not deliberately indifferent in their treatment of a visibly intoxicated detainee when they returned him to his cell, without medical treatment, on the recommendation of a jailhouse nurse).[8]

As the night continued, Michalik learned that Kowalewski had vomited on the floor. Vomiting is "a clear manifestation of internal physical disorder." Helphenstine, 60 F.4th at 318 (punctuation modified) But, as the Defendants' expert points out, its internal causes can be relatively benign and do not always constitute a medical emergency. Ross Rpt. at PageID.599. Here, Michalik spoke with Kowalewski about why he had vomited, and he heard from Kowalewski himself that he had an upset stomach and did not have a condition that required medical attention. Because Kowalewski's behavior—vomiting, but remaining alert and conversational—was perfectly consistent with this untroubling explanation, it provides no grounds for inferring that Michalik perceived a serious risk to Kowalewski at this point. Cf. Winkler v. Madison Cnty., 893 F.3d 877, 893–894 (6th Cir. 2018) ("Hacker, after all, had self-reported that he was going through opiate withdrawal, and . . . Hacker's symptoms were consistent with such a diagnosis. Dr. Al-

---

[8] The Defendants correctly point out that Michalik was entitled to rely on the reasonably specific, reasonably recent professional opinion of a medical professional. See Mot. at PageID.503 (citing Stojcevski v. Macomb Cnty., 827 F. App'x 515, 522 (6th Cir. 2020)). But this argument has limits. It would not shield Michalik from liability if Earley established that Kowalewski showed obvious signs of medical distress after his return from hospital, because officers' deference to medical opinion becomes unreasonable if the detainee's condition "significantly worsen[s]," such as through "the onset of new and alarming symptoms." Stojcevski, 827 F. App'x at 522.

Shami thus had no reason to suspect that Hacker was suffering from anything other than opiate withdrawal.")

Later, Michalik removed Kowalewski to the detox cell after seeing him, shirtless, become agitated, ask to leave the cell, and kick and punch the partition—but these behaviors were consistent with emotional agitation or, as Michalik testified, "some sort of mental health issue." Michalik Dep. at PageID.565; see Gray v. City of Detroit, 399 F.3d 612, 614, 616 (6th Cir. 2005) (finding no deliberate indifference by an officer who did not seek medical attention when a detainee, during apparent "mood swings," "appeared agitated," "rant[ed]," and "destroy[ed] some of his holding cell"); Lawler, 93 F.4th at 935–936 (finding no deliberate indifference by an officer who ignored a detainee's "odd and unresponsive conduct," taking it to mean simply that the detainee was "upset"). Finally, seeing Kowalewski motionless but breathing on the floor of the detox cell, Michalik could have reasonably concluded that Kowalewski was sleeping after a restless night. Cf. Burwell, 7 F.4th at 470–471 (finding no deliberate indifference by an officer who saw a detainee lying unconscious on the floor of his cell for roughly eighty-five minutes but did not "investigate[] further," because "it is not uncommon for detainees to sleep on the cell floor").[9]

In sum, given the availability of benign explanations for Kowalewski's symptoms, his symptoms cannot on their own support an inference that Michalik knew that Kowalewski was in

---

[9] This analysis is not significantly affected by Michalik's knowledge or ignorance of Kowalewski's history of alcohol withdrawal. Even if Michalik knew Kowalewski's medical history, as Earley contends he did, knowledge that a detainee has a history of withdrawal is different from knowledge that a detainee is currently in a condition that poses substantial health risks. See Preyor v. City of Ferndale, 248 F. App'x 636, 644 (6th Cir. 2007) (holding that the defendants knew of a substantial risk to a detainee whom they knew was in active heroin withdrawal). In fact, even knowledge that a detainee is in active withdrawal is not on its own sufficient to alert a jailer to the detainee's serious medical need. Helphenstine, 60 F.4th at 321.

serious danger. Nor was Michalik's behavior over the course of the night consistent with deliberate indifference to Kowalewski's needs. He checked on Kowalewski at least twice an hour, and more often when Kowalewski was in the detox cell. When he learned that Kowalewski had vomited, he asked whether Kowalewski needed medical care, and when he saw Kowalewski's agitation, he moved Kowalewski to the detox cell for his own safety and increased the frequency of his cell checks. On two separate occasions, he called emergency services when he became concerned about Kowalewski's health. Perhaps a more observant or more cautious jailer would have investigated Kowalewski's condition further or summoned medical attention sooner, and Michalik might have saved Kowalewski's life if he had done so. But there can be no liability where a detainee's tragic death results, not from deliberate indifference, but from mere "negligence" or "bad luck." Arrington-Bey v. City of Bedford Heights, 858 F.3d 988, 990 (6th Cir. 2017). Thus, in the absence of evidence that he actually knew of the serious risk to Kowalewski, Michalik is entitled to qualified immunity.

### 3. The Other Individually Named Defendants' Deliberate Indifference

The eight other individually named Defendants are entitled to summary judgment on the claims against them because Earley's briefing only addresses the deliberate indifference of defendant Michalik. See Resp. at PageID.675–678.[10] A plaintiff's claim is deemed abandoned or forfeited when she fails to address it in her response to a motion for summary judgment. Bennett v. Hurley Med. Ctr., 86 F.4th 314, 324 (6th Cir. 2023). And medical indifference claims, which hinge on Defendants' mental states, require courts to "evaluate each defendant individually"; we

---

[10] Earley also "concedes Lieutenant Hill was not deliberately indifferent to the Decedent's objectively serious medical needs." CSOMF ¶ 31. As the Defendants note, Earley thus seems to agree that the claim against Hill should be dismissed. Reply at PageID.960.

cannot "impute knowledge from one defendant to another." Greene, 22 F.4th at 607 (punctuation modified). Earley simply has not offered any evidence as to the culpability of these Defendants.

## B. The Inadequate Training Claim

Earley's remaining federal claim is a claim against the City of Taylor. But municipal liability under § 1983 attaches only to constitutional violations inflicted by the municipality itself, not to violations inflicted solely by municipal employees or agents. Helphenstine, 60 F.4th at 323 (punctuation modified). A plaintiff must, therefore, prove that her injury occurred because of a "municipal policy or custom." Id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).

Systematically inadequate training of police officers may constitute a custom or policy capable of founding municipal liability. City of Canton v. Harris, 489 U.S. 378, 388 (1989).[11] However, municipal liability "is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011). Plaintiffs must do more than prove that the training program was not "the best and most comprehensive available." Shotts v. City of Taylor, No. 23-12647, 2025 WL 3565109, at *15 (E.D. Mich. Dec. 12, 2025) (quoting Lewis v. City of Irvine, Kentucky, 899 F.2d 451, 455 (6th Cir. 1990)).

To establish such a claim, a plaintiff must show that: "(1) the training program is inadequate to the task the officer must perform, (2) the inadequacy is a result of the municipality's deliberate indifference, and (3) the inadequacy is closely related to or actually caused the plaintiff's injury."

---

[11] There are three other recognized theories of municipal liability: in addition to showing "the existence of a policy of inadequate training or supervision," a plaintiff may show "the existence of an illegal official policy or legislative enactment," "the existence of a custom of tolerance or acquiescence of federal rights violations," or "that an official with final decision making authority ratified illegal actions." Helphenstine, 60 F.4th at 323 (quoting Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)). Earley pursues only an inadequate training theory. See Resp. at PageID.670–673.

Greene, 22 F.4th at 616 (punctuation modified).  Here, even assuming that Earley can establish the inadequacy of the jail's training program and the deliberate indifference of the City, she has not shown that there is a triable causation issue.

Earley's theory is based on the contention that Kowalewski's death was caused by the City of Taylor's policy or custom of failing to provide police officers with adequate "training related to alcohol withdrawal."  Resp. at PageID.671–672.  She has provided evidence—Michalik's testimony—that jailers did not receive training related to alcohol withdrawal and its symptoms. Id. at PageID.671 (citing Michalik Dep. at PageID.549).  Moreover, while the Defendants contend that Michalik "understands the basic science of alcohol withdrawal symptoms" and would seek medical attention for a detainee suffering from withdrawal, Earley points out that Michalik testified to his unfamiliarity with any withdrawal symptoms other than tremors.  Compare SOMF ¶ 18 with Resp. at PageID.672 (citing Michalik Dep. at PageID.549).  Nor did the jail employ on-site medical personnel who might have training in responding to withdrawal symptoms.  Finally, while Earley does not dispute the Defendants' claim that a death like Kowalewski's had "never before occurred" in the Taylor jail, see Mot. at PageID.499, she contends that detainee withdrawal is nonetheless a recurring situation in the jail, pointing to Michalik's testimony that it is common for detainees to experience withdrawal in Taylor custody.  Resp. at PageID.672–673.

Claims similar to Earley's—failure-to-train claims premised on the absence of withdrawal-related training for jailers—are not uncommon.  Earley is correct that, especially when a jail does not have on-site medical staff, jailers' first aid training may be inadequate if it does not include training in recognizing and responding to drug and alcohol withdrawal.  See, e.g., Grote v. Kenton Cnty., 85 F.4th 397, 415–416 (6th Cir. 2023) ("Lack of overdose and drug-related training can

23

certainly create municipal liability where . . . officers are principally responsible for handling medical care.").

In <u>Helphenstine</u>, for example, the defendant county's jailers had basic first aid and CPR training, and several individual defendants testified to their understanding of how to recognize medical emergencies in general or withdrawal-related medical emergencies in particular. 60 F.4th at 324. But the Sixth Circuit held that a jury might still conclude that the jailers were not adequately trained to "identify or address a medical emergency," in part because their first aid training did not include specific "training on how to identify a withdrawal-related medical emergency." <u>Id.</u> at 324–326. Such a gap in jailers' training would be unproblematic if the jailers worked alongside trained medical professionals, but this jail did not have round-the-clock medical staff on site: detainees were "almost wholly reliant on the jailers" for access to medical care, including in withdrawal-related medical emergencies. <u>Id.</u>[12]

Moreover, some courts have held that a plaintiff created a jury question on the municipality's deliberate indifference by showing that the municipality failed to institute withdrawal-related training for jailers, even though withdrawal was prevalent in municipal jails. While plaintiffs often prove deliberate indifference by establishing a "pattern of similar constitutional violations by untrained employees," they may also prove deliberate indifference by establishing "a single violation of federal rights, accompanied by a showing that [the municipality]

---

[12] Other courts in the circuit have likewise held that a plaintiff casts doubt on the adequacy of a jail's training by showing that jailers did not receive training on withdrawal-related medical needs that they were likely to encounter in the course of their duties. See, e.g., <u>Stojcevski</u>, 2019 WL 4744432, at *21; <u>Larrick v. Tuscarawas Cnty.</u>, No. 21-00959, 2023 WL 6311396, at *30 (N.D. Ohio Sept. 28, 2023); <u>Rice v. Montgomery Cnty.</u>, No. 14-181, 2016 WL 2596035, at *15 (E.D. Ky. May 5, 2016); <u>Finn v. Warren Cnty.</u>, No. 10-00016, 2012 WL 3066586, at *20 (W.D. Ky. July 27, 2012), <u>rev'd in part on other grounds</u>, 768 F.3d 441 (6th Cir. 2014); <u>Stefan v. Olson</u>, No. 10-671, 2011 WL 2621251, at *15–16 (N.D. Ohio July 5, 2011), <u>aff'd</u>, 497 F. App'x 568 (6th Cir. 2012).

has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." Shadrick v. Hopkins Cnty., Kentucky, 805 F.3d 724, 739 (6th Cir. 2015) (punctuation modified). When withdrawal is common in a municipality's jail—so that jailers are likely to encounter detainees undergoing withdrawal—the municipality's failure to train jailers about withdrawal may create an obvious risk of constitutional violations, sufficient to prove deliberate indifference. See, e.g., Stojcevski, 2019 WL 4744432, at *16, 21 (holding that, even without evidence of multiple withdrawal-related detainee deaths in the defendant county, "the county's need to train its jail staff regarding drug withdrawal in general, and benzodiazepine withdrawal, in particular" was "obvious" because jail personnel were "likely" to encounter inmates undergoing severe withdrawal from benzodiazepine and other drugs); Rice, 2016 WL 2596035, at *15 (likewise holding that the prevalence of detainee withdrawal created obvious potential for constitutional violations when jailers did not receive withdrawal-related training).

Based on this authority, it can be concluded that Earley has raised at least a question of fact that the absence of withdrawal-related training renders the City's training program inadequate and is the result of municipal deliberate indifference. However, to survive summary judgment, she must also show that the training deficiency she identified is "closely related to or actually caused the plaintiff's injury." Greene, 22 F.4th at 616 (punctuation modified).

This is not an easy burden to carry. The Supreme Court has held that, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of . . . causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Brd. Of Cnty. Cmm'r of Bryan Cnty. v. Brown, 520 U.S. 397, 405 (1997). Earley's claim fails at this hurdle, because she has not provided causation evidence. Her only argument on the causation issue is that Kowalewski

"was left to deteriorate in his jail cell over the course of eight-and-a-half hours, during which he is seen exhibiting all of the signs of delirium tremens and alcohol withdrawal."   Resp. at PageID.673.   However, the question is whether inadequate training <u>caused</u> this regrettable situation—whether it would have been averted if Michalik and his colleagues had received adequate withdrawal-related training.   <u>See</u> <u>City of Canton</u>, 489 U.S. at 391 ("Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?").   In this regard, Earley's claim is obstructed by the dearth of evidence about whether and how withdrawal-related training would have influenced the jailers' decision-making with respect to Kowalewski.

Such evidence is crucial because the causation inquiry requires the fact-finder to predict "how a hypothetically well-trained officer would have acted under the circumstances."   <u>Id.</u> at 391. In withdrawal cases like this one, inadequate training has no causal import if adequately trained jailers "would have made the same treatment decisions" that the defendant jailers did.   <u>Griffith</u>, 975 F.3d at 584–585.   There must be specific respects in which the officers' conduct deviated from practices that they should have been trained to follow and that would have prevented the detainee's death.   Thus, at a minimum, the plaintiff must show that the detainee died from symptoms that were "mismanaged and ignored" by inadequately trained officers.   <u>Helphenstine</u>, 60 F.4th at 326; <u>see also</u> <u>Shadrick</u>, 805 F.3d at 743–744 (treating evidence of gross inadequacies in the inadequately trained officers' treatment decisions as evidence of a causal relation).   It is insufficient simply to assert a causal relation: summary judgment is justified if the plaintiff "has not spelled out . . . her theory regarding a crucial question in the causation chain: [w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"   <u>Carey v. Helton</u>, 70 F. App'x 291, 294 (6th Cir. 2003) (punctuation modified);

26

see also Austin v. Mosley, No. 20-12938, 2023 WL 2696202, at *8 (E.D. Mich. Mar. 29, 2023), aff'd, No. 23-1425, 2025 WL 448879 (6th Cir. Feb. 10, 2025) (granting summary judgment when the plaintiff did "not point to evidence that shows how, if [officers] had received additional or different training, the training would have prevented" the officers from violating her rights).

Caselaw provides examples of how plaintiffs can show causation in the withdrawal context. Like Earley, the plaintiff in Stefan contended that a detainee had died of withdrawal symptoms because of officers' inadequate withdrawal-related training. 2011 WL 2621251, at *15–16. The officers knew that the detainee was in active alcohol withdrawal but conducted only "cursory" monitoring of him through the cell window and therefore failed to recognize his deteriorating condition until he had a fatal seizure. Id. at *5–6. The plaintiff created a triable issue on causation by providing detailed evidence about how the officers' actions and treatment decisions would have differed if they had received adequate withdrawal-related training. Specifically, medical professionals opined that a competent evaluation of withdrawal symptoms would involve regular physical examinations of the detainee and his cell. Id. at *5–6, 16. Had the officers conducted such examinations, they would have noticed that the detainee had vomited. Id. at *16. And—a jail nurse testified—had they reported that the detainee had vomited to the medical staff, the medical staff would have reassessed the detainee before his seizure. Id. Thus the court found that the plaintiff had supported a chain of inferences that could lead a jury to conclude that, if the officers had been properly trained in evaluating withdrawal symptoms, the detainee "might not have had the seizure" that killed him. Id.

Likewise, in Finn, the plaintiff precluded summary judgment on a similar claim by presenting expert causation evidence suggesting that the jailers failed to take the necessary life-saving measures for the decedent because of their lack of withdrawal-related training. 2012 WL

3066586, at *21.  One of the plaintiff's expert witnesses opined "that the deputy jailers failed to recognize the serious deterioration of [the detainee]'s condition and bring it to the attention of the medical personnel because they had never been trained to recognize the signs of alcohol withdrawal."  Id.  And another expert opined not just that the detainee's death was preventable with appropriate medical care but that "part of the reason [the detainee] did not receive appropriate care was a lack of proper monitoring" by the inadequately trained jailers.  Id.

In stark contrast to the plaintiffs in Stefan and Finn, Earley does not provide any evidence of a connection between inadequate training and the decisions that Kowalewski's jailers made.  Neither she nor her experts suggest, for example, that withdrawal-related training would have led the Taylor jailers to monitor Kowalewski more closely, to detect symptoms that Michalik missed, or to recognize Kowalewski's illness from the symptoms that Michalik saw.  She does not suggest that adequate training would have led Michalik to appreciate that Kowalewski required immediate medical treatment.

Earley's medical expert opines that Kowalewski showed symptoms of severe withdrawal in the video footage, but he does not claim that Kowalewski's condition would have been apparent to Michalik if he had received adequate withdrawal-related training.  See Bates Rpt. at Page ID.824–825.  In other words, while the expert's opinion supports the contention that Kowalewski's death was preventable with proper treatment, it does not support the contention that proper training was the key to proper treatment.

The opinion of Earley's policing expert, John Stanley, is no more helpful to Earley's claim.  Stanley opines that "Michalik's inability to recognize the symptoms of Steven's Kowalewski's medical distress . . . reflected a deficiency in his training" and "led directly to [Kowalewski's] death."  Stanley Rpt. at PageID.814–815, 819 (Dkt. 48-12).  But the deficiency that Stanley has in

28

mind seems to relate to Michalik's basic first aid training or, more precisely, his failure to "perform in a manner consistent with" the first aid training that the City provided.  Stanley Rpt. at PageID.815, 817; see also Stanley Dep. at PageID.876–879 (Dkt. 48-14) (opining that Michalik should have conducted a physical first aid assessment upon seeing Kowalewski motionless in the detox cell).  Stanley is also critical of the jailers' "ignorance of Parkinson's," which he opines prevented Michalik and Payne from recognizing that Kowalewski's tremors were not related to Parkinson's disease.  Stanley Rpt. at PageID.800–801, 805.  But Stanley testified that he has no criticism of Taylor's failure to institute withdrawal-related training.  Stanley Dep. at PageID.836.[13] And it is the absence of withdrawal-related training—not the jailers' basic first aid training or lack of Parkinson's-related training—that Earley contends makes the jailers' training inadequate and on which the causation inquiry must center.

In sum, then, the record provides no reason to believe that an adequately trained jailer would not have made precisely "the same treatment decisions" as Michalik did.  Griffith, 975 F.3d at 584–585.  Thus, Earley has not "spelled out" a crucial link in the "causation chain."  Carey, 70 F. App'x 294.  This does not mean that Michalik's actions were correct or prudent, nor that the City's practice of forgoing withdrawal-related training is above reproach.  But it does mean that, on this record, the City's training practices were not closely related enough to Kowalewski's death to provide a basis for municipal liability.

### C. State-Law Claims

---

[13] This testimony appears to represent at least a partial retreat from the position Stanley took in his report, where he opined that the Taylor jailers did not "receive adequate training to recognize the signs of alcohol withdrawal" and that "a training protocol should be implemented to ensure that all Taylor Police Department personnel are familiar with the symptoms of alcohol withdrawal." See Stanley Rpt. at PageID.815, 818.

Because Earley has failed to state a federal cause of action against the Defendants, the Court will decline supplemental jurisdiction over the state-law claim in Count II alleged against the Taylor Defendants.  See 28 U.S.C. § 1367(c)(3).  The claim is denied without prejudice.[14]

### III. CONCLUSION

For the foregoing reasons, the Court grants the Taylor Defendants' motion for summary judgment (Dkt. 47).

**SO ORDERED.**

Dated: March 20, 2026                          s/Mark A. Goldsmith
Detroit, Michigan                              MARK A. GOLDSMITH
                                               United States District Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 20, 2026.

                                               s/Joseph Heacox
                                               JOSEPH HEACOX
                                               Case Manager

---

[14] With the dismissal of the federal claims against the moving Defendants, there remains no federal claim in the case.  Because there are non-moving Defendants against whom only state law claims have been asserted (Beaumont Hospital, Oakwood Healthcare, Kaitlin McDonald, and related entities), the Court will give Plaintiff and those Defendants an opportunity to address whether the claims asserted against them should be dismissed without prejudice.

30